**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8   GERALD L. RIGHETTI,                      No. C-11-2717 EMC

9              Plaintiff,

                                             **ORDER GRANTING DEFENDANTS'**
10       v.                                   **MOTIONS FOR SUMMARY**
                                             **JUDGMENT**
11   CALIFORNIA DEPARTMENT OF
     CORRECTIONS AND REHABILITATION,         **(Docket Nos. 149, 156)**
12   *et al.*,

13             Defendants.
     _____/
14

15                   I.    **INTRODUCTION**

16          Plaintiff Gerald Righetti – a California state prisoner – has brought Eighth Amendment

17   against a Certified Nurse Assistant ("CNA") and two doctors responsible for treating his left hip

18   following an accidental fall.  Righetti is a triplegic (he can only move his right arm), but he has full

19   sensation in his non-ambulatory limbs.  He requires assistance for even the most basic activities.  On

20   July 11, a CNA accidently dropped Righetti while moving him from his bed to a wheelchair, causing

21   a fracture to Righetti's left femur at the hip joint.  The fracture was not discovered for two weeks

22   and surgery was not conducted to repair his hip for a month and a half.  Righetti argues that the

23   Defendants failure to correctly diagnose and treat his broken hip constitutes deliberate indifference

24   to a serious risk to his health.  Defendants have moved for summary judgment.  For the following

25   reasons, Defendants' motions are **GRANTED**.[1]

26

27   _____

28          [1] Righetti's request for file a sur-reply is **GRANTED**.  The Court has considered the
     arguments contained in the sur-reply located at Docket No. 187.

United States District Court

For the Northern District of California

## II.   FACTUAL & PROCEDURAL BACKGROUND

A.   Factual Background

The following facts are either not in dispute or where they are disputed, they are ultimately construed in Plaintiff's favor.

1.   Righetti's Fall, Injury, and Initial Hospital Visit

On July 11, 2007, Certified Nursing Assistants ("CNA") Guzman and Zuniga were transferring Righetti from his bed to his wheelchair.  Declaration of Micah Osgood ("Osgood Decl."), Ex. B, at 2 (Docket No. 152-2).  During that process, Guzman caused the bed rail to which Righetti was holding to go down, resulting in Righetti falling approximately three feet onto the hard floor.  *Id.*  Righetti "banged' his head and also claimed that he had pain in his "tailbone."  Osgood Decl., Ex. I , at 2 (Docket No. 153-5).[2]  Dr. Nguyen was paged.  *Id.* at 3.

When Dr. Nguyen arrived, he observed a bruise on Righetti's right temple and abrasions on his right upper back.  Declaration of Dr. Duc V. Nguyen ("Nguyen Decl.") at 4 (Docket No. 149-2).  He noticed no deformity or tenderness in his lower back.  *Id.*  Dr. Nguyen ordered the following immediate treatment: (1) He prescribed a shot of Toradol for Righetti's asserted pain (Osgood Decl., Ex. G, at 1 (Docket No. 151-3)[3]) and (2) he ordered x-rays of the head, neck, and spine (*Id.*).  The x-rays showed no fractures.  Nguyen Decl. ¶ 9; Osgood Decl., Ex. M, at 1 (Docket No. 151-12).

When Righetti returned from receiving the x-ray, he reported to the nurse that his pain was "better" when he was back in bed.  Osgood Decl., Ex. I, at 3.  The nurse noted bruises with no skin break on Righetti's back and that Righetti was complaining of a headache on the right side of his head.  *Id.*  Dr. Nguyen prescribed Tylenol for Righetti's headache and pain, and the nurse gave him Tylenol at 4:00 p.m.  Nguyen Decl. ¶ 9; Osgood Decl., Ex. I, at 3.  At 5:45 p.m., Righetti informed the nurse that his headache was not improving, so the nurse paged Dr. Bowman.  Osgood Decl., Ex.

---

[2] Docket No. 153-5 (Exhibit I to the Osgood Declaration) consists of the daily nursing records for the relevant time period (arranged in chronological order).  For each day, these records purport to record the medicine provided to Righetti, his activities, and any incidents, complaints, or issues raised.

[3] Docket No. 151-3 (Exhibit G to the Osgood Declaration) consists of Dr. Nguyen's orders (prescriptions, test orders, etc.) during the relevant period.

United States District Court

For the Northern District of California

I, at 3. Dr. Bowman examined Plaintiff and noted that the "primary complaint" was pain in the right "parietal region" of the head and that the Tylenol was not helping. Osgood Decl., Ex. F, at 1 (Docket No. 151-2).[4] Dr. Bowman also noted that Righetti's left knee was tender and swollen. Osgood Decl., Ex. I, at 3. Dr. Bowman prescribed Demerol (an opioid pain reliever) and ordered x-rays of the right knee to be done the next morning. *Id.*; Osgood Decl., Ex. G, at 2.

The following morning, Righetti reported that the pain in his left knee intensified to a 10 out of 10 upon movement. He received another shot of Demerol and Phenergan. Osgood Decl., Ex. I, at 6. The nurses noted that the knee was more swollen that it had been the day before and was tender to the touch. *Id.* Plaintiff was given Motrin for the pain, his left knee was x-rayed, and the nurses established a "pain care plan" for Righetti. *Id.* Righetti stated that his left knee was "ok" if he did not move it. *Id.* The hospital's health care manager ordered that Righetti's range of motion stretching exercises be halted in light of the injury. Declaration of Peter A. Chalich ("Chalich Decl.") ¶ 9 (Docket No. 149-1); Osgood Decl., Ex. I, at 6. Dr. Nguyen ordered 600mg of Motrin, 4 times per day, as needed for pain. Osgood Decl., Ex. G, at 750.

That afternoon, Plaintiff complained that his headache had become a lot worse, with blurred vision, sensitivity to light, and building pressure. Osgood Decl., Ex. I, at 7. Dr. Nguyen examined Righetti and ordered him sent to the emergency room at Natividad Medical Center. *Id.*; Osgood Decl., Ex. F, at 2. In his contemporaneous journal kept at the time, Righetti complained of having a lot of pain in his upper left leg. Osgood Decl., Ex. O, at RJ035, RJ065 (Docket No. 151-14).[5]

The admission paperwork at Natividad state that the chief complaint is "Headache + blurry vision." Osgood Decl., Ex. N, at 209 (Docket No. 153-13). Righetti states in his journal and declaration that he told the doctor at the hospital that his "upper left leg" and hip hurt, especially with movement. Declaration of Gerald Righetti ("Righetti Decl.") ¶ 7 (Docket No. 173-1); Osgood Decl., Ex. O, at RJ065. An x-ray of the left knee was taken, and it showed no fractures or

---

[4] Docket 151-2 (Exhibit F to the Osgood Declaration) consists of the interdisciplinary progress notes arranged in chronological order. These are the notes from the examination of Righetti by the various doctors.

[5] Docket No. 151-14 (Exhibit O to the Osgood Declaration) is Righetti's handwritten journal for the relevant time period.

United States District Court

For the Northern District of California

dislocations in the knee.  Osgood Decl. Ex. N, at 214.  Further, a CT scan of his head was done.  *Id.*

Ultimately, the hospital staff diagnosed Righetti as having a concussion.  *Id.*  Righetti wrote in his

journal that he told Natividad staff that his upper left leg hurt, but only left knee x-rays were done.

Osgood Decl., Ex. O, at RJ065.  Righetti was provided with Vicodin for the pain.  Osgood Decl., Ex.

N, at 217.  He was then returned to Salinas Valley State Prison.

2. <u>Righetti's Complaints of Pain Through July and Dr. Nguyen's Treatment</u>

The nursing records indicate that in the morning of July 13, 2013, Righetti stated that his

pain was better (5/10 on the pain scale), worse when moved.  Osgood Decl., Ex. I, at 544.  Plaintiff

requested that his range of motion exercises be restarted, but the nurse stated that a doctor would

need to be consulted.  *Id.*  Dr. Nguyen then saw Righetti, and said that he was "ok" to do his range

of motion exercises, as long as the pain would permit and Righetti wanted to do them.  Osgood

Decl., Ex. G, at 751; Ex. O, at RJ066.  Dr. Nguyen also noted an edema (or accumulation of fluid

with accompanying swelling) on Righetti's left knee.  Nguyen Decl. ¶ 14.  Dr. Nguyen also noted

that the CT scan conducted at Natividad the previous day was negative.  *Id.*  According to Righetti's

journal, Dr. Nguyen informed him that his CT-scan and x-ray of the left knee showed no broken

bones.  Osgood Decl., Ex O, at RJ066.

Nurse Chalich performed the range of motion exercises later that morning.  He was able to

do the exercises as normal on the right side, but the left side had limited mobility and were not done

because of Righetti's complaints of pain.  *Id.*, Ex. I, at 544.  According to Chalich, the "main area of

pain was above the left knee medially, which means on the inside of the thigh."  Chalich Decl. ¶ 11;

*see also* Osgood Decl., Ex. I, at 544.  Later that afternoon, Righetti was transferred to his wheel

chair and he went out into the yard.  Osgood Decl., Ex. I, at 544.  That evening, he was given Motrin

for the pain in his left knee and head.  *Id.* at 545.

On the morning of July 14, Righetti reported a pain of 6/10 (it is unclear from the record

where he felt this pain) and was given Motrin.  Osgood Decl., Ex. I, at 547.  Range of motion

exercises were performed.  *Id.*  No complaints of pain are recorded later during the day.  *Id.*  That

night, he reported "mild pain to [left] knee."  *Id.*  Around 5:00 a.m. on July 15, Righetti reported a

pain of 8/10.  *Id.* at 549.  He was given Motrin for the pain.  *Id.*  Range of motion exercises were

United States District Court

For the Northern District of California

1   conducted, and Righetti mentioned that he was "stiff and sore" on the left side.  *Id.*  Righetti went

2   out to the yard and reported no further pain during the day.  *Id.*

3      The morning of July 16, Righetti reported to the nurse that he was "tender and stiff on left

4   side and left leg."  *Id.* at 551.  A nurse conducted range of motion exercises.  *Id.*  Righetti was then

5   placed in his wheelchair and went out to the yard.  *Id.*  Dr. Nguyen next examined that afternoon and

6   noted an edema on his left arm, but noted that Righetti did not have complaints regarding it.  Osgood

7   Decl., Ex. F, at 742.  In his journal, Righetti states that he told Dr. Nguyen that his left leg was in

8   "severe" pain, especially when moved, but that Dr. Nguyen only looked at it and did not touch it.

9   *Id.*  He also states that Dr. Nguyen would only give him Motrin.  *Id.*; Righetti Decl. ¶ 16.  Righetti,

10  however, does not indicate whether he requested a different medication and, if so, what that

11  medication was.  That evening, Righetti reported to a nurse a pain of 7/10 in his left leg and was

12  provided Motrin.  Osgood Decl., Ex. I, at 551.

13     In the morning of July 17, Righetti reported a pain of 7/10 in his left leg on movement.  *Id.* at

14  553.  He was provided Motrin "per request."  *Id.*  Later in the morning, range of motion exercises

15  were conducted.  *Id.*  He was transferred to his wheelchair and went out to the yard.  *Id.*  That

16  evening, Righetti was awake in bed and exercising by "pushing into the trapeze."  *Id.*  The nurse

17  reported that he had no complaints and made no requests.  *Id.*

18     At noon on July 18, Righetti had a physical therapy session.  He complained to the physical

19  therapist about increased pain in the left hip in the area of the "hip flexons."  Osgood Decl., Ex. H, at

20  667 (Docket No. 151-4).  The physical therapist advised Righetti on how to position himself so as to

21  minimize muscle spasms in the area.  *Id.*  Righetti states that the physical therapist looked and

22  touched his leg and told Righetti that he would need muscle relaxers.  *Id.*, Ex. O, at RJ067.

23     At 1:00 p.m., Dr. Nguyen examined Righetti.  Nguyen Decl. ¶ 16.  Righetti complained of

24  left thigh/hip pain.  Osgood Decl., Ex. F, at 742.  Righetti wrote in his journal that he informed the

25  doctor that he was in a lot of pain "all night – had to sit up to sleep left hip killing me."  *Id.* Ex. O, at

26  RJ066.[6]  The medical record from this day states that Dr. Nguyen observed no tenderness in the left

27  _____

[6] In his deposition, Righetti admitted that it was a "possibility" that July 18 was the first time
28  he mentioned to Dr. Nguyen that his left *hip* was in pain.  Osgood Decl., Ex. T, at 29:10 (Docket No.
152-9).

**United States District Court**
For the Northern District of California

1   hip or thigh and Dr. Nguyen states he would have checked this by "palpitating his leg."  Nguyen

2   Decl. ¶ 16.  However, Righetti's journal states that Dr. Nguyen did not touch his left leg.  *Id.*, Ex. O,

3   at RJ066-067; *see also* Righetti Decl. ¶ 18.  Righetti also states that Dr. Nguyen told him in response

4   to his complaints of pain that the x-rays showed no broken bones and that "it is ok."  *Id.* at RJ066.

5   Righetti opines that Dr. Nguyen was treating him like he was faking the pain.  *Id.* at RJ067.

6         After his meeting with Righetti, Dr. Nguyen spoke with Righetti's physical therapist and,

7   based on the therapist's recommendation, ordered that Righetti be given muscle relaxants,

8   analgesics, and be placed on bed rest.  Dr. Nguyen prescribed Baclofen (a muscle relaxer to treat

9   pain/stiffness in muscles) as well as ibuprofen for pain and to reduce swelling.  Nguyen Decl. ¶ 16;

10  Osgood Decl., Ex. F, at 742.  At midnight, the nurse paged a number of doctors (including Dr.

11  Bowman and Dr. Nguyen) regarding Righetti's complaints regarding left leg pain and because there

12  did not appear to be an order for the prescribed Baclofen, but could not get reach them.  Osgood

13  Decl., Ex. I, at 555-56.

14        On the morning of July 19, Righetti asked a nurse to have Dr. Nguyen to increase the

15  Baclofen dosage (thus suggesting that Baclofen had been provided by that point).  Osgood, Ex. I, at

16  558.  According to Righetti's journal, the nurse returned and said that Dr. Nguyen said "no."  *Id.*,

17  Ex. O, at RJ067.  Righetti reported that Dr. Nguyen was "heartless" for not increasing the dose even

18  though he was in "a lot of pain."  *Id.*  Range of motion exercises were conducted.  *Id.*, Ex. I, at 558.

19        Dr. Nguyen next examined Righetti on July 20, at 1:00 p.m.  Nguyen Decl. ¶ 17.  Dr.

20  Nguyen increased the Baclofen dosage from 5mg to 10mg.  *Id.*  Righetti continued to complain

21  about pain in his left thigh, but noted that the Baclofen helped with the pain.  *Id.*  Dr. Nguyen

22  conducted an exam and found no edema, redness, or tenderness in the thigh.  *Id.*  He states in his

23  declaration that he believed Righetti's pain was caused by a pulled muscle.  *Id.*  Later that evening,

24  Dr. Nguyen prescribed Vicodin to be given at bed time, as needed for the pain, and again increased

25  the Baclofen dosage to 20mg three times per day.  Osgood Decl., Ex. G, at 752.

26        A nurse conducted range of motion exercises on the morning of July 22.  Righetti refused to

27  have the exercises done on his left leg because it was too sore.  *Id.*, Ex. I, at 565.  He further told the

28  nurse that his leg has been "so sore he has not been sleeping well and is tired all the time."  *Id.*

**United States District Court**

For the Northern District of California

The morning of July 23, Righetti woke up complaining of pain in his back and hips (8/10). *Id.* at 567. Later that morning, Dr. Nguyen examined Righetti. Nguyen Decl. ¶ 18. Righetti complained of continued pain in his left thigh, so Dr. Nguyen prescribed an increased dosage of Vicodin and changed the Baclofen dosage from 20mg three times per day to 10mg four times per day. *Id.* He also ordered a "CPK" test, designed to determine the extent of any stress or injury to his muscles. *Id.*; *see also* Osgood Decl., Ex. F, at 744. In his journal, Righetti stated that Dr. Nguyen told him he would increase the Baclofen dosage, but that the order Dr. Nguyen wrote out actually *reduced* it from 60mg per day (20mg three times a day) to 40mg per day (10mg four times a day). Osgood Decl., Ex. O, at RJ067-68. Righetti asked a nurse to get in touch with Dr. Nguyen and have him "get back" to Righetti. *Id.* at RJ068. Apparently Dr. Nguyen did not do so, and Righetti wrote in his journal that Dr. Nguyen had "screwed" him again. *Id.*

On July 24, Plaintiff woke up complaining of pain (9/10) in his left knee and back. He was given Ibuprofen for pain. Osgood Decl., Ex. I, at 570. Later in the morning he was given Vicodin and Baclofen as scheduled. *Id.* Dr. Nguyen corrected the Baclofen dosage to 20mg, four times per day. Osgood Decl., Ex. G, at 753. According to the nursing report, Righetti told the nurses that he was "feeling better" and that the Vicodin and Baclofen had "reduced the muscle spasm pain." *Id.*, Ex. I, at 570. That night, Righetti had no complaints of pain. *Id.*

On July 25, Righetti informed the nurse that the pain in his left hip was the "main source of pain" and that the pain in the left knee is "better." *Id.*, Ex. I, at 572. He told the nurse that the pain in his hip was worse when he was lying down than when he was laying at a 45 degree angle. *Id.* Righetti received Vicodin and Baclofen in the morning. *Id.* Dr. Nguyen examined Righetti and, according to the Dr. Nguyen's record, Righetti informed the doctor that his left "thigh pain" was better. *Id.*, Ex. F, at 745. Righetti's journal, by contrast, states that he told Dr. Nguyen that he was in "a lot of pain in left hip area" and that Dr. Nguyen did not even look at his leg. *Id.*, Ex. O, at RJ068. Dr. Nguyen ordered the treatment (pain medication) to continue. *Id.*, Ex. F, at 745. Later in the day, Righetti was seen by his physical therapist. *Id.*, Ex. I, at 572. The physical therapist noted Righetti's apparent "hypersensitivity to hip flexor stretch left resulting in spasms/pain." *Id.*, Ex. H, at 668. The physical therapist recommended that an x-ray be conducted of Righetti's left hip

United States District Court
For the Northern District of California

1   because it was "possible [Righetti] may have ha[d] an exacerbation of his internal joint problems"

2   that Righetti suffered prior to his fall.  *Id.*  Later in the day, Dr. Nguyen issued an order for the x-ray

3   on Righetti's left hip.  *Id.*, Ex. G, at 754.

4         3.    <u>Righetti's Fracture Is Discovered and He is Again Sent to the Hospital</u>

5         The x-ray was done on the morning of July 26 and revealed a fracture in his left hip, and Dr.

6   Nguyen sent Righetti back to Natividad Medical Center's emergency room for treatment.  Nguyen

7   Decl. ¶ 20.  When Righetti arrived at Natividad, he was initially seen by Dr. Michael Moeller.

8   Declaration of Robert Sanford ("Sanford Decl."), Ex. H, at 639-640 (Docket 163-1).[7]  Dr. Moeller

9   noted that Righetti was complaining of left hip and leg pain and gave him shots of 2 different pain

10  killers.  *Id.* at 639.  He was also given an EKG.  *Id.* at 647.  Righetti claims that the emergency room

11  doctor (presumably Dr. Moeller) told him that he would need surgery to repair his broken left hip.

12  Righetti Decl. ¶ 25.

13        It is undisputed that at some point Dr. Moeller consulted with Defendant Dr. Richman – an

14  orthopedic surgeon "on call" at Natividad – by telephone.  Deposition of Dr. Richman ("Richman

15  Depo.") at 73, 74 (Docket No. 173-4); Declaration of Dr. Richman ("Richman Decl.") ¶ 4.  It is

16  further undisputed that as part of this consultation Dr. Richman did not review any medical records,

17  x-rays, or physically examine Righetti.  Richman Depo. at 75.  Rather, he relied on Dr. Moeller

18  providing him (over the phone) with "enough information to come up with an assessment and plan"

19  for Righetti.  *Id.*  Dr. Richman asserts that the "main things" Dr. Moeller told him was that Righetti

20  was "triplegic, that he had an intertrochanteric hip fracture and that it was two weeks old" and that

21  Righetti was a prisoner.  *Id.* at 80-81.  In addition, there were a number of facts that he assumed to

22  be true, because he believed Dr. Moeller would have told him otherwise if it was not the case.

23  Specifically, he assumed it was not an "open" fracture (i.e. one with a bone protruding through the

24  skin or with a wound that penetrates down to the bone), that there were no "extenuating

25  circumstances" like vascular compromise, and that the patient was not in excruciating or

26

27

28        [7] Docket No. 163-1 (Exhibit H to the Sanford Declaration) is the list of Natividad records resulting from the July 26 visit to Natividad.

United States District Court
For the Northern District of California

1    uncontrolled pain.  *Id.* at 83-84.  Thus, Dr. Richman has stated that he believed Righetti's pain was

2    being managed because Dr. Moeller would have told him if it was not.  Richman Decl.  ¶ 5.

3         Dr. Richman ultimately determined that surgery was not necessary.  There are indications in

4    the record that Dr. Richman made this decision based solely on the fact that Righetti is triplegic.  For

5    example, Dr. Moeller wrote on Righetti's chart the following: "Consulted [with] Dr. Richman.  Due

6    to [patient] triplegia, [patient not] candidate for surgery, [patient] non-ambulatory."  Sanford Decl.,

7    Ex. H, at 640.  Additionally, the "Physician Request for Services" form filled out by a physician's

8    assistant stated under "findings": "consult w/ orthopedic Dr. Richman, [patient] non-operable

9    [secondary to] triplegic."  Osgood Decl., Ex. I, at 580.  This is consistent with Dr. Nguyen's records,

10   where Dr. Nguyen wrote that a physician assistant from Natividad called him to state that "their

11   orthopedic [sic] do not feel [inmate] needs surgery" because he "has no ambulation secondary to

12   triplegic."  *Id.*, Ex. F, at 746.  Finally, Righetti states that an unnamed emergency room doctor said

13   that "the Natividad orthopedic surgeon and Defendant Nguyen had decided that they would not

14   repair my broken bone because I could not walk."  Righetti Decl. ¶ 25.

15        Dr. Richman, however, claims he never stated that Righetti "was not a candidate for surgery

16   because he was a non-ambulatory triplegic or for any other reason."  Richman Decl. ¶ 7.  Rather, he

17   says he determined that *emergency* surgery was not indicated on that day for three reasons: (1) The

18   fracture was two weeks old, and intertrochanteric fractures "may heal without surgery"; (2) major

19   surgery that was required has risks (infection, bleeding, causing more pain); and (3) because Righetti

20   was a non-ambulatory triplegic, emergency surgery was not necessary to prevent further

21   displacement or to return him to ambulatory status.  *Id.* ¶ 6; *see also* Richman Depo. at 92.  Dr.

22   Richman concluded that a conservative course of treatment – allow the fracture to heal on its own,

23   control pain with medication, and schedule a follow up to monitor the fracture – was warranted.

24   Richman Dec. ¶ 6.  Dr. Richman also states he recommended a follow-up examination at the

25   Natividad Orthopedic clinic which would allow him time to see the state of healing.  *Id.*  ¶ 7.  This

26   recommendation is recorded in the "Physician Request for Services Form" where it states, under

27

28

United States District Court

For the Northern District of California

recommendations: "Needs ortho f/u 1 wk.  pain management, Dr, Richman ortho clinic.  Dr. Nguyen informed."  Osgood Decl., Ex. I, at 580.[8]

When he returned to prison, Righetti states that Defendant Zuniga failed to properly position his mattress causing him to not be able to lie in the correct position.  Righetti Decl. ¶ 26.  When he asked Zuniga to try, she gave a "half-hearted try" and made "smart comments in an attempt to provoke me."  *Id.* She eventually positioned him correctly, but was "very rough with [him] when she did."  *Id.*

When Righetti returned to the prison he was "upset" about the lack of surgery.  Nguyen Decl. ¶ 26; Osgood Decl., Ex. F, at 745.  Dr. Nguyen stated he would speak to the physical therapist to determine if Righetti could bear weight in his leg.  Osgood Decl., Ex. F, at 746.  Additionally, he stated he would seek a "2nd orthopedic opinion."  *Id.*  Righetti refused offers of Vicodin, MS Contin, or Tramadol, stating that they "only treat the symptoms of my pain.  They do not treat the cause of the pain which is a broken leg caused by CTC Staff.  I am not going to allow [prison] staff to get me addicted to these drugs which will happen if I follow this course of treatment."  Osgood Decl., Ex. K, at 737; *see also id.*, Ex. F, at 746.

During the remaining days of July, Plaintiff experienced continued pain and continued to refuse narcotic pain medication out of fear of becoming addicted.  Righetti Decl. ¶¶ 27-31.  However, the records indicate he continued to receive Baclofen.  On July 30, 2007, Righetti alleges that Defendant Zuniga was "rough with [his] care."  *Id.*  ¶ 30.

On July 30, Dr. Nguyen examined Righetti and noted that he "insists in resuming his prior activity (i.e., going to yard, shower)."  Osgood Decl., Ex. F, at 748.  Dr. Nguyen advised that if he resumed that activity it would "increase pain again and may cause complication."  *Id.*  The complications Dr. Nguyen was referring to were the alignment of his fractured hip.  Nguyen Depo. at 227.  Despite this warning, Righetti either took showers or went to the yard (or both) every day

---

[8] This follow up never happened.  Dr. Nguyen could not recall if he was in fact informed about the follow up recommendation, but stated "I'm assuming it was if that's what it says." Nguyen Depo. at 274.  In his deposition, Dr. Nguyen places the blame on this follow up being missed because of trouble they had with Natividad sending back the paperwork with the patient, and that if the paperwork had not been in the chart, he would have "no idea" of the need for the follow up.  *Id.*

United States District Court

For the Northern District of California

1  until at least August 16.  *See generally* Osgood Decl., Ex. I.  Also during the July 30 exam, Dr.

2  Nguyen again stated that he would speak to the physical therapist to determine if Righetti could bear

3  weight and then talk again to an orthopedic specialist.  *Id.* at 748.

4          4.          Continued Treatment and Eventual Surgery

5          On August 1, 2007, Righetti was seen by a physical therapist.  Osgood Decl., Ex. H, at 669.

6  While the physical therapist concluded that surgical repair of the leg would not increase the ability

7  of Righetti to bear weight on the left leg, he concluded that "[o]rthopedic surgery should be

8  considered for present and long-term comfort" because (1) with the fracture, range of motion

9  exercises were contraindicated, thus affecting Righetti's comfort and (2) repairing the hip would

10  "make bed mobility and transfers less painful."  *Id.*  Dr. Nguyen spoke with the physical therapist on

11  this day and noted that the physical therapist stated that Righetti's weight bearing ability was

12  "scant."  Nguyen Decl. ¶ 28.  It is unclear, however, if Dr. Nguyen also spoke with the physical

13  therapist about his recommendation for surgery.  During the day, the nursing records indicate that

14  Righetti stated his pain level was "tolerable" while sitting.  Osgood Decl., Ex. I, at 595.  That

15  evening, he took a Vicodin to help him sleep.  Righetti Decl. ¶ 32.

16          On August 3, 2007, Righetti reported in his journal that his "leg hurts all the time - like a

17  knife in my left leg."  *Id.*, Ex. O, at RJ071-72.  Dr. Nguyen examined Righetti that day, and

18  according to the record from this examination, Dr. Nguyen contacted several (a total of five) outside

19  orthopedic surgeons, but they stated either they did not do surgery on prisoners, the surgeon was not

20  in the office, or otherwise did not respond.  Osgood Decl., Ex. F, at 674.  In his description of the

21  course of treatment, Dr. Nguyen stated he would continue to attempt to contact outside orthopedic

22  specialists for a consult.  *Id.*  Righetti in his journal acknowledges that Dr. Nguyen told him he

23  would continue to try to get a second orthopedic consultation from U.C. Davis.  *Id.*, Ex. O, at RJ072.

24          On August 4, 2007, Righetti claims that Defendant Zuniga "pushed very roughly on my left

25  leg while caring for me" and that his leg "hurt[] like hell."  Righetti Decl. ¶ 34.  Similarly, on

26  August 7, 2007, Righetti reports that Zuniga "continued to be rough with [his] care."  *Id.* ¶ 35.

27          Also on August 7, 2007, Dr. Nguyen contacted an orthopedist at the University of California

28  Davis.  Nguyen Decl. ¶ 30.  According to Dr. Nguyen's notes, the orthopedist stated that "surgery

1    not indicated" since Righetti is not ambulatory and would not walk again.  *Id.*; Osgood Decl., Ex. F,

2    at 675.  The following day, Righetti complained to Dr. Nguyen that he noticed that his left leg and

3    foot had begun "twisting to the outside" and that he had to sit "twisted" in his wheelchair.  Righetti

4    Decl. ¶ 36.  Dr. Nguyen had Righetti sent for further x-rays on his left hip because he wanted to see

5    if the fracture had increased.  Osgood Decl., Ex. O, at RJ072; *Id.* Ex. F, at 676.  Dr. Nguyen stated

6    he would re-contact the U.C. Davis orthopedist to "go over x-ray." *Id.*, Ex. F, at 676.

7        On August 10, 2007, Dr. Nguyen again consulted with the U.C. Davis orthopedist as well as

8    a "thin hips specialist."  Nguyen Decl. ¶ 31.  His notes indicate that he "[p]resented case scenario

9    including [Righetti's] complaint that it causes him to lean to left."  Osgood Decl., Ex. F, at 677.  He

10   wrote that the impression was that there was no need for surgery and that the pain should be

11   managed medically and that the fracture should be monitored.  *Id.*  Accordingly, he ordered continue

12   medication and ordered follow-up x-rays to allow for monitoring the fracture.  *Id.*  Righetti states

13   that when Dr. Nguyen saw him on this day, he relayed what the U.C. Davis orthopedists stated and

14   said that his hip was healing without surgery.  *Id.*, Ex. O, at RJ072.  He also states Dr. Nguyen noted

15   the alignment issues with Righetti's leg, foot, back, and hips.  *Id.*

16       On August 15, 2007, Dr. Nguyen again examined Righetti.  Osgood Decl., Ex. F, at 678.

17   Righetti complained about his body not aligning properly because of his left hip.  *Id.*  Dr. Nguyen

18   reviewed the x-rays from August 12, and the knee x-rays suggested that Righetti had "linear

19   sclerosis, which may be a healing subacute fracture line." *Id.*  He also told Righetti that he had

20   spoken about the situation with multiple orthopedists who recommended simply monitoring the

21   fracture for displacement and that there was no indication at that time for surgery.  *Id.*  The

22   following day, Dr. Nguyen again saw Righetti and advised him that he was lifting the bed rest order

23   per Righetti's request, but warned him that moving around could worsen his fracture.  *Id.*  Dr.

24   Nguyen also informed Righetti that he would be seen by the U.C. Davis orthopedist via Telemed.

25   *Id.*; *see also id.*, Ex. O, at RJ073-74.  Another x-ray of his left hip was taken.  *Id.*

26       The following day, Dr. Nguyen received the results of the August 8 x-ray.  This x-ray

27   revealed displacement in Righetti's fracture.  Nguyen Decl. ¶ 34.  Dr. Nguyen advised Righetti that

28   in light of the displacement, he had to be careful due to the risk of the fracture breaking all the way

12

United States District Court

For the Northern District of California

1  through, making a repair more difficult.  Righetti ¶ 40.  In the days following, Righetti continued to

2  experience increasing pain in his leg and continued to receive medication to assist with the pain.

3  *See, e.g.*, Osgood Decl., Ex. I, at 623, 625, 627, 629, 631, 633; *see also* Righetti Decl. ¶¶ 40-42.

4  The Telemed appointment that Dr. Nguyen had set up for Righetti with the U.C. Davis

5  orthopedist occurred on August 26, 2007.  Osgood Decl., Ex. F, at 680.  The orthopedist

6  recommended a repair of the area with a plate and screws.  *Id.*; Nguyen Decl. ¶ 35.  The following

7  day, Dr. Nguyen contacted a Dr. Lewis in Bakersfield and scheduled Righetti for surgery on

8  September 4, 2007.  Nguyen Decl. ¶ 36; Osgood Decl., Ex. F, at 681.  For the rest of August,

9  Righetti continued to experience pain in his leg and continued to receive pain medication.  *See, e.g.*,

10  Osgood Decl., Ex. I, at 645, 651, 655, 657.  After two pre-surgical consultations with additional

11  orthopedists, Righetti's fracture was surgically repaired on September 6, 2007.  *Id.* at 666; Klein

12  Decl. ¶ 24.  This surgery was conducted by Dr. Clement Alade of Mercy Hospital in Bakersfield.

13  Docket No. 173-11.

14  Righetti states that on August 28, 2007, Defendant Zuniga dropped his left leg while she was

15  holding it, causing "a lot of pain."  Righetti Decl. ¶ 46.  Similarly, on September 1, 2007, Righetti

16  states that Zuniga pushed hard on his leg causing immense pain and dizziness.  *Id.* ¶ 49.  When he

17  complained, she "just laughed."  *Id.*

18  B.    Plaintiff's Grievances

19  On July 22, 2007, Righetti filed a grievance relating to CAN Guzman causing the underlying

20  fall.  Osgood Decl., Ex. B, at 435.  After recounting the July 11, 2007 incident, Righetti requested

21  the following action: "That CNA Guzman be counseled not to rush and to consider the sequencing

22  of her actions to the health and safety" and that he "receive monetary compensation for the pain and

23  suffering I am having to endure due to CNA Guzman's" act.  *Id.*  This grievance was exhausted up

24  through the director's level and was partially granted.  Specifically, "medical staff [was] provided

25  refresher training on lifting patients" and the supervising nurse, Righetti, and all of the CNA's met

26  together to allow Righetti "the opportunity to air his concerns."  *Id.*, Ex. C, at 14.  Righetti's request

27  for monetary compensation was denied as beyond the scope of the inmate appeals process.  *Id.*

28

United States District Court

For the Northern District of California

Righetti filed a second grievance on August 6, 2007 relating to the failure of the prison medical staff to properly diagnose his leg fracture. He stated that on July 26, 2007 his leg was finally diagnosed as broken, but "at least three times between the date of trauma 7-11 and 7-26 Doctor Nguyen told me that I had no broken bones even though I was in tremendous pain." *Id.*, Ex. D, at 464. He made three requests: (1) that his broken leg be "properly repaired by surgery"; (2) that Dr. Nguyen not be his primary physician; and (3) that he receive compensatory and punitive monetary damages. *Id.* His grievance was denied at the informal level. The reviewer noted that Righetti had received pain medication and that Natividad and U.C. Davis staff found surgical intervention was not indicated. The reviewer found that the conservative approach to allow the fracture to heal on its own – with pain medication to manage the pain – was reasonable. *Id.* In between the denial of this grievance (on August 15, 2007) and the processing of Righetti's second level appeal (September 13, 2007), Plaintiff had surgery. Accordingly, the second level of review was partially granted, but his requests to have Dr. Nguyen reassigned and monetary damages was denied. *Id.* at 465. Righetti's appeal was denied at the Director's level on March 7, 2008. *Id.*, Ex. E, at 2.

C.     Righetti's Claims and the Instant Motions

Righetti filed the operative third amended complaint ("TAC") on April 18, 2013. Docket No. 124. The complaint alleges one cause of action against Dr. Nguyen, Dr. Richman, and CNA Zuniga alleging that each of these defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs by failing to take reasonable measures to address it. TAC ¶ 47. In addition, as to CNA Zuniga, Righetti alleged that she roughly handled his fractured leg and laughed in response to the pain. TAC ¶ 38.

All defendants have moved for summary judgment. Dr. Nguyen argues he is entitled to summary judgment on the ground that Righetti has not shown that Dr. Nguyen was aware of, and consciously disregarded, a serious risk to Righetti's health. He further argues that he did not fail to provide Righetti with treatment in response to his complaints of pain. Docket No. 149. CNA Zuniga has moved for summary judgment, because Righetti failed to exhaust the administrative remedies with regards to any claim against her and, in any event, he has shown no evidence that she

United States District Court

For the Northern District of California

1    was deliberately indifferent.  *Id.* at 12-14.  Dr. Richman argues he is entitled to qualified immunity

2    because he did not inflict unnecessary pain on Righetti, but rather assessed Righetti's injury based

3    on the information he had before him at the time.  Docket No. 156.

### III.   DISCUSSION

5    Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

6    the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7    affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

8    party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine

9    only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

10   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

11   "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on

12   which the jury could reasonably find for the [nonmoving party]." *Id.* at 252, 106 S.Ct. 2505. At the

13   summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving

14   party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255, 106

15   S.Ct. 2505.

16   A.   Dr. Nguyen and Dr. Richman Are Entitled to Summary Judgment as There Is No Triable

17   Issue as to Whether He Consciously Disregarded a Substantial Risk to Righetti's Health

18   "[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action

19   under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  In order to state a claim under § 1983,

20   the plaintiff must first show a "serious medical need" by showing that failure to treat his condition

21   resulted in further significant injury or the unnecessary and wanton infliction of pain.  *See Lemire v.*

22   *Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081 (9th Cir. 2013).  Second, the plaintiff must show

23   the defendant's response to the "serious medical need" was deliberately indifferent.  *See id.*  For

24   purposes of their summary judgment motions, the Defendants have not disputed that Righetti's hip

25   injury represents a "serious medical need."  Rather, the critical question posed by Defendants'

26   motions for summary judgment is whether the Defendants' responses to this need constitute

27   "deliberate indifference."

28

United States District Court
For the Northern District of California

1    Deliberate indifference is a stringent standard – the indifference must be "substantial." *See,*

2    *e.g.*, *Lemire*, 726 F.3d at 1081; *Giron v. Corr. Corp. of Am*, 191 F.3d 1281, 1286 (10th Cir. 1999).  It

3    is not enough for a plaintiff to show that prison medical staff was negligent, grossly negligent, or

4    even engaged in medical malpractice.  *See Snow v. McDaniel*, 681 F.3d 978, 987-88 (9th Cir. 2012),

5    *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) ("Even proof that a

6    physician has committed medical malpractice does not necessarily violate the Eighth Amendment.");

7    *see also Lemire*, 726 F.3d at 1081-82 ("'[T]he indifference to [a prisoner's] medical needs must be

8    substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this

9    [claim].'  Even gross negligence is insufficient to establish deliberate indifference to serious medical

10    needs." (quoting *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980)).  Instead, deliberate

11    indifference is a *subjective* standard – the plaintiff must demonstrate that the officials *knew* of and

12    *disregarded* the substantial risk of harm and failed to act despite this knowledge.  *Id.* at 1074.  In

13    other words, the official "'must both be aware of the facts from which the inference could be drawn

14    that a substantial risk of serious harm exists, and he must also draw the inference.'" *Clement v.*

15    *Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

16    "Indifference may appear when prison officials deny, delay or intentionally interfere with

17    medical treatment, or it may be showing in the way in which prison [officials] provide medical

18    care." *Jett v. Penenr*, 439 F.3d 1091, 1096 (9th Cir. 2006).  Accordingly, "'[a] prisoner need not

19    prove that he was completely denied medical care'" to prevail on an Eighth Amendment claim.

20    *Snow*, 681 F.3 at 986 (quoting *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000)).  However, that

21    the plaintiff – or even other medical professionals – disagree with the defendants' chosen course of

22    treatment is insufficient to create a triable issue of fact.  *See, e.g.*, *Toguchi v. Chung*, 391 F.3d 1051,

23    1058 (9th Cir. 2004) ("[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of

24    law, to establish deliberate indifference.'" (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.

25    1996)).  Rather the inmate must show that the chosen course of treatment was "medically

26    unacceptable under the circumstances" and chosen in "conscious disregard to an excessive risk" to

27    the inmate's health.  *Id.*

28

United States District Court

For the Northern District of California

1.      <u>Claim Against Dr. Nguyen</u>

Righetti has failed to show the existence of a genuine dispute as to whether Dr. Nguyen chose a course of medical treatment in conscious disregard to an excessive risk to Righetti's health. As to Dr. Nguyen's conduct prior to the July 26 x-ray which revealed the existence of the hip fracture, Righetti argues that deliberate indifference can be inferred from the fact that Dr. Nguyen: (1) did not to conduct a "medically appropriate examination"; (2) ignored serve and worsening pain in Righetti's "hip, thigh, and knee area"; and (3) continued a course of ineffective pain medication. Righetti Opp. at 18-20.  The Court disagrees.

The record reveals that there is a genuine dispute of fact as to whether Dr. Nguyen conducted an examination which involved palpating or directly examining Righetti's thigh or hip at any point prior to July 26.  However, even if it is assumed (as it must on summary judgment) that no such exam took place and even, as argued by Righetti's expert, that such an examination was medically called for, this would only establish that Dr. Nguyen was negligent, or, at worse, had engaged in medical malpractice.  This fact is insufficient to establish deliberate indifference.  *See Lemire*, 726 F.3d at 1081-82.  A number of courts have rejected deliberate indifference claims in similar circumstances.  For example, in *Rega v. Beard*, Civ. No. 08-156, 2011 WL 7094571 (W.D. Pa. Dec. 13, 2011), the district court noted:

> Of course, Plaintiff's complaint is, in part, that had Ms. Lukas conducted a more thorough exam on March 31, 2007, she would have been able to confirm the veracity or extent of Plaintiff's injuries and ordered him pain medication then rather than on April 2, 2007. However, Plaintiff does not deny that Ms. Lukas came to his cell and provided some examination if only a visual inspection and made some inquiries concerning his state, even if he denies that she conducted as extensive an examination as reflected in the contemporaneously created progress notes.

*Id.* at *6 n.5.  The court ultimately concluded that even "accepting Plaintiff's version of the 'exam' such a cursory exam at most constitutes negligence."  *Id.*; *see also, e.g.*, *English v. Winn Corr. Ctr.*, 548 F. App'x 287 (5th Cir. 2013) (rejecting claim that prison officials failed properly to examine the plaintiff); *Machado v. Cal. Dep't of Corr.*, CV 13-1703-CAS DFM, 2013 WL 6860613, at *9 (C.D. Cal. Dec. 30, 2013) (finding that allegations that defendant conducted a "rudimentary" examination that failed to document cuts and bruises did not rise to the level of a constitutional violation because

United States District Court

For the Northern District of California

1   there was no indication that the "lack of care was the result of anything other than inadvertence,

2   negligence, or even malpractice").

3         Further, the undisputed record belies Righetti's argument that Dr. Nguyen "ignored"

4   Righetti's worsening pain. On July 11, the day of the injury, Dr. Nguyen ordered a shot of toradol[9]

5   and prescribed Tylenol for Righetti's pain. Osgood Decl., Ex. G, at 1; Ex. I, at 3. The following

6   day, he prescribed a substantial dose of ibuprofen, four times a day. Osgood Decl., Ex. G, at 750.

7   On July 18, when the pain continued despite the ibuprofen, Dr. Nguyen – per the physical therapists

8   recommendation – prescribed a muscle relaxant (Baclofen). Nguyen Dec. ¶ 16; Osgood Decl., Ex.

9   F, at 742. Righetti reported that the Baclofen helped with the pain, and Dr. Nguyen twice adjusted

10  the Baclofen dosage to help with the pain. Nguyen Decl. ¶ 17; Osgood Decl., Ex. G, at 752.

11  Further, on July 20, Dr. Nguyen prescribed vicodin – a strong narcotic – as needed for pain. Osgood

12  Decl., Ex. G, at 752. Far from "ignoring" the worsening pain, Dr. Nguyen engaged in a progressive

13  course of pain management treatment. *Cf. Morrison v. Mamis*, No. 08 Civ. 4302, 2008 WL 5451639

14  (S.D.N.Y. Dec. 18, 2008) (finding no deliberate indifference in part, because the doctor "responded

15  to Morrison's continued complaints of pain by prescribing Elvail upon Morrison's complaining that

16  the Ibuprofen was not working, and then increasing the Elvail dosage twice."); *Garcia v. Bondoc*,

17  No. 1:09-cv-01674, 2011 WL 2414381 (E.D. Cal. June 8, 2011) ("Defendant Wrigley prescribed

18  two new medications and then increased the dosage on a follow up visit in response to Plaintiff's

19  complaints [regarding his pain. It is apparent that Plaintiff was receiving treatment for his serious

20  medical condition.").

21        However, Righetti argues that deliberate indifference can be inferred by the very fact that Dr.

22  Nguyen continued on a course of pain medication despite its apparent ineffectiveness. However,

23  courts have often held that a doctor does not engage in deliberate indifference by choosing a

24  conservative course of treatment revolving around pain management as opposed to surgery. *See,*

25  *e.g.*, *Brooks v. Hammond*, No. C11-2104-JCC, 2013 WL 4401823, at *8 (W.D. Wash. Aug. 15,

26  2013) (no constitutional violation for attempting conservative course of treatment prior to surgical

27

28        [9] Toradol is a drug used to treat "moderately severe, acute pain." *Perez v. Chater*, 17 F.
Supp. 1115, 1120 (C.D. Cal. 1997).

hip joint replacement); *Alls v. CorrectHealth, Inc.*, 1:11-CV_2977-TWT-AJB, 2011 WL 6371905, at *3 (N.D. Ga. Nov. 21, 2001).

In addition, Dr. Nguyen's chosen course of treatment appears to have been motivated by his incorrect belief that Righetti's pain was the result of a muscle injury (rather than any deliberate indifference to Righetti's condition).   *See* Nguyen Decl. ¶ 21; Osgood Decl., Ex. F, at 744 (Dr. Nguyen writing on July 20 his belief that the pain could be caused by a pulled muscle); *id.* (Dr. Nguyen ordering a "CPK" test on July 23 – a blood test to determine extent of muscle stress or injury).  This belief was reinforced by the physical therapist who, in response to a July 18 exam which included palpating Righetti's leg, noted that Righetti had "hypersensitivity" in his hip flexors causing muscle spasms.  *Id.* Ex., H. at 668.  The physical therapist noted that it was possible that Righetti "had an exacerbation of his internal joint problems" from an injury the year prior.  *Id.* at 668.  The therapist recommended that Righetti be given muscle relaxants and use certain positions to reduce the frequency of the muscle spasms.  *Id.*, Ex. H, at 667, 668; Ex. O, at RJ067.  Further, the record reveals that the muscle relaxant prescribed – Baclofen – improved Righetti's pain.  *See, e.g.*, *Id.*, Ex. I, at 570.

Of course, Dr. Nguyen was incorrect in his belief and, had a more thorough examination been conducted, he may have recognized the nature of Righetti's injury up to two weeks earlier.  However, an honest (though mistaken) belief strongly undercuts any argument that a defendant acted with deliberate indifference.  *See, e.g.*, *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) ("The defendant's belief that his conduct poses no risk of serious harm . . . need not be sound so long as it is sincere.  Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.");  *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (no deliberate indifference where defendants "sincerely and honestly believed" their actions were medically justifiable);  *Qian v. Kautz*, 168 F.3d 949, 956 (7th Cir. 1999).  Thus, in *Wilhelm v. Rotman*, 680 F.3d 1113 (9th Cir. 2012), the Ninth Circuit affirmed the dismissal of deliberate indifference claims against a doctor for failing to operate on plaintiff's hernia.  *Id.* at 1123.  The doctor in question, a surgeon, examined plaintiff for "two seconds" and concluded on the basis of that perfunctory examination that there was "no definite hernia" – despite the fact two doctors had previously diagnosed him with a hernia.

United States District Court

For the Northern District of California

*Id.* at 1116-17.  The court found that the allegations against the surgeon were insufficient to show deliberate indifference because the surgeon "decided not to operate because he thought that Plaintiff was not suffering from a hernia."  Accordingly, because the allegations sounded in negligent misdiagnosis, the claims were dismissed.  *Id.* at 1123.  Nothing in the record suggest Dr. Nguyen knew that Righetti suffered from a fracture rather than *e.g.*, a muscle injury.

Nor does Dr. Nguyen's treatment of Righetti after July 26 support a finding of deliberate indifference.  Most significantly, the record reveals that after being returned from Natividad without any surgery having been performed, Dr. Nguyen conducted a number of follow-ups with orthopedic experts to determine if surgery was, in fact,  indicated.  Osgood Decl., Ex. F, at 674-678, 746; *Id.*, Ex. O, at RJ072; Nguyen Decl. ¶¶ 30-31.  Additionally, Dr. Nguyen ordered continued strong pain medication[10] and monitored the progression of the fracture through continued x-rays.  Osgood Decl., Ex. O, at RJ072; *Id.* Ex. F, at 676.  Dr. Nguyen received information from other medical practitioners that indicated a conservative course of treatment was appropriate.  These are not the actions of a deliberately indifferent medical provider.

Nonetheless, Righetti contends that Dr. Nguyen's post-July 26 conduct is evidence of deliberate indifference because he "knowingly provid[ed] incomplete or inaccurate information regarding Mr. Righetti's condition to third-party specialists."  Righetti Opp. at 19.  He primarily relies on the declaration of his expert, Dr. Klein, who faults Dr. Nguyen for (1) not providing the

---

[10] At a certain point, Righetti began to refuse narcotic pain medication out of a fear of becoming an addict.  His expert describes this decision as "reasonable" and "prudent" but does not state that the prescription of narcotic or opiate pain relievers in this case was "medically unacceptable."  While Righetti undeniably had the right to refuse such medication, he may not base his claim against Dr. Nguyen on his own decision to refuse medication.

The simple fact that Righetti disagreed with Dr. Nguyen's course of treatment is insufficient to establish "deliberate indifference."  *See Toguchi*, 391 F.3d at 1058.  Applying this principle, courts have found no deliberate indifference where a patient refuses a doctor's prescribed treatment and then attempts to hold the doctor liable for the results.  *See, e.g., Snyder v. Law*, No. 9:09-CV-1364, 2010 WL 5572768, at *4 (N.D.N.Y. Dec. 21, 2010);  *Thompson v. Bel*, 07-CV-193T-30MAP, 2007 WL 569858, at *2 (M.D. Fla. Feb. 20, 2007) ("Where, as Plaintiff acknowledges, the Defendant offered him medication to treat his condition and he refused the medication because he disagrees with the doctor's assessment, Plaintiff cannot prevail on an Eighth Amendment claim . . . . His allegations amount to no more than a difference of opinion as to the course and scope of treatment for his condition.").

**United States District Court**

For the Northern District of California

1   specialists with x-rays or medical history; (2) not telling the specialists that Righetti still had

2   sensation in the leg; and (3) that he used the term "triplegic" to describe Righetti, but that Righetti is

3   not "triplegic" but rather paraparetic.  Klein Decl. ¶¶ 9, 23, 34, 37.

4        The Court finds this argument unpersuasive.  As an initial matter, the record reveals that the

5   specialists were aware that Righetti had sensation in his legs.  Dr. Nguyen's case notes reveal that

6   the specialists recommended that Dr. Nguyen continue treating Righetti with pain medication – a

7   recommendation that would not make sense if they were under the impression that Righetti lacked

8   sensation in his legs or hip.  *See* Osgood Decl., Ex. F, at 677 (Dr. Nguyen writing that he "Presented

9   case scenario including I/m complaint that [fracture] cause him to lean to left.  Impression is no

10  surg[ery], *manage pain medically*, and monitor the [fracture]" (emphasis added)).  Further, the Court

11  rejects Righetti's argument based on the term "paraparetic" as opposed to "triplegic."  First, in his

12  pro se third amended complaint, Righetti repeatedly refers to himself as triplegic.  TAC ¶ 3, 12, 17.

13  Second, an orthopedic specialist who examined Righetti prior to his surgery and conducted a

14  comprehensive orthopedic assessment, wrote: "The patient is a triplegic.  He has been triplegic for

15  the past 12 years.  There is complete sensation, but no motor function in the lower extremities."

16  Schmalz Decl., Ex. 8, at 2 (Docket No. 173-10).  Righetti has simply made no showing that had the

17  choice of the term "triplegic" was material to the advice Dr. Nguyen received from the consulted

18  specialists.  Finally, there is nothing in the record to suggest that Dr. Nguyen's failure to provide the

19  specialists with copies of x-rays was the result of a conscious disregard of a risk to Righetti's health.

20       The Eighth Amendment does not constitutionalize the field of medical malpractice, nor does

21  it permit federal courts to second guess the medical judgment of doctors with the benefit of

22  hindsight.  As alleged, Dr. Nguyen's treatment of Righetti was not perfect.  A more thorough

23  examination at the beginning may have revealed the fracture earlier.  Further, there was an isolated

24  incident regarding an error in Righetti's medication dosage.  Finally, taking all inferences in the

25  light most favorable to Righetti, it appears Dr. Nguyen failed to send Righetti back to Natividad for

26  his follow-up with Dr. Richman.  However, the Ninth Circuit has commanded that in determining

27  whether the facts of a case support a finding of deliberate indifference, the court must "scrutinize the

28  particular facts and look for substantial indifference in the individual case, indicating more than

United States District Court
For the Northern District of California

1    mere negligence or isolated occurrences of neglect." *Wood v. Housewright*, 900 F.2d 1332, 1334

2    (9th Cir. 1990).

3           The errors for which Righetti faults Dr. Nguyen do not give rise to a genuine dispute of

4    material fact as to whether Dr. Nguyen acted with deliberate indifference in treating Righetti after

5    the fall.  This is not a case where a doctor failed to render any diagnosis or medical treatment or

6    inexplicably delayed providing treatment in the face of a clear or undisputed need.  For example, in

7    *Snow v. McDaniels*, the Ninth Circuit found a triable issue as to whether Nevada's "Utilization

8    Review Panel" was deliberately indifferent to plaintiff's medical need for hip surgery where treating

9    physicians had, over the course of years, made repeated "urgent" and "emergency" requests for

10   surgery, outside orthopedic specialists had recommended surgery, and there were indications that

11   plaintiff's painkillers were damaging his kidneys.  *Snow*, 681 F.3d at 988 ("While a medication-only

12   course of treatment may have been medically acceptable for a certain period of time, the question

13   remains whether it was medically unacceptable and subjectively reckless to ignore a 'long term'

14   recommendation for three years, or to ignore 'emergency' and 'urgent' requests for more than two

15   years.").  Similarly, in *Wilhelm v. Rotman*, one of the defendant doctors had diagnosed plaintiff as

16   suffering from a hernia and stated that surgery was required.  However, the doctor inexplicably did

17   not refer plaintiff to a surgeon for over a year.  The court concluded that these allegations were

18   sufficient to state a claim for deliberate indifference.  *Wilhelm*, 680 F.3d at 1123.

19          Rather, the record demonstrates that Dr. Nguyen misdiagnosed Righetti's injury and chose a

20   course of treatment consistent with this initial error.  Dr. Nguyen prescribed for Righetti a variety of

21   pain medication and diagnostic tests.  As soon as the fracture was diagnosed, Dr. Nguyen pursued

22   treatment options.  Although there was some delay, Righetti's fracture was surgically repaired

23   within two months.  While there was an unfortunate delay in treatment, neither the initial

24   misdiagnosis nor the subsequent treatment Righetti received gives rise to an inference that Dr.

25   Nguyen's actions were the result of conscious disregard of Righetti's medical needs.  Accordingly,

26   because Righetti has failed to demonstrate the existence of a genuine dispute as to whether Dr.

27   Nguyen was deliberately indifferent to his medical needs, the Court **GRANTS** Dr. Nguyen's motion

28   for summary judgment.

United States District Court
For the Northern District of California

2.      Claim Against Dr. Richman

Dr. Richman was involved in Righetti's treatment on only one day – July 26, when Righetti presented to Natividad with a broken left femur and the emergency room doctor consulted with Dr. Richman over the telephone. Righetti's claim against Dr. Richman is predicated on his alleged failure to adhere to professional standards and the resultant "denial" of surgery on that date.

The record reveals a dispute of fact as to whether Dr. Richman's failure to meet with Righetti in person during the orthopedic consult was medically unacceptable. On one hand, Righetti's expert Dr. Klein states that the American Academy of Orthopaedic Surgeons states that orthopedist consults should be done in person. Klein Decl. ¶ 43. Accordingly, Dr. Klein believes that the failure to interview or examine Righetti when he was diagnosed with an intertrochanteric fracture, was medically unacceptable. *Id.* ¶ 44. On the other hand, Dr. Richman's expert, Dr. Thomas Sampson, argues that the same orthopaedic academy recognizes that a telephonic consultation between orthopedist and treating physicians is a "common practice well within the standard of care." Sampson Rebuttal Decl. ¶ 4a. Even if this dispute is resolved in favor of Righetti as it must on summary judgment, this shows, at most, that Dr. Richman acted negligently – it does not establish deliberate indifference. *See Daniel v. Kaiser*, 46 F.3d 1140 (9th Cir. 1995) ("Plaintiff's expert's disagreement with the course and competency of treatment prescribed by the doctors, even if such testimony is credited as conclusively establishing negligence in diagnosis or treatment, cannot establish deliberate indifference."). Deliberate indifference is a question of *subjective* intent – a question on which Dr. Klein can have no insight. *See Toguchi*, 391 F.3d at 1059 ("Although Dr. Tackett opined that Dr. Chung [the defendant] "disregarded [the] serious and known risks" of combining the three drugs, his conclusion was merely speculative, because he lacked any insight into Dr. Chung's subjective knowledge. Dr. Tackett's opinion was predicated upon his position that Dr. Chung administered the medications without assessing Keane's actual medical condition and without regard to possible withdrawal symptoms. This accusation is one of negligence as opposed to deliberate indifference.").

As to the merits of Dr. Richman's decision not to perform surgery on July 26, Righetti argues that Dr. Richman refused surgery simply because Righetti was non-ambulatory. While Dr. Richman

United States District Court

For the Northern District of California

1   contests that Righetti's lack of ambulation served as the basis for rejecting surgery, there are

2   indications in the record that it was at least a factor in his decision. *See* Sanford Decl., Ex. H, at

3   640; Osgood Decl., Ex. I, at 580; *Id.*, Ex. F, at 746. Dr. Klein asserts this decision was "medically

4   unacceptable," Klein Decl. ¶ 46, while Dr. Sampson asserts that Righetti's non-ambulatory status

5   was properly considered in determining the course of available treatment options, Sampson Rebuttal

6   Decl. ¶ 5 & n.1 ("In fact, non-operative treatment of intertrochanteric fractures in triplegic or

7   parapetic patients is well within the standard of care for treatment of Mr. Righetti's intertrochanteric

8   fracture."). This disagreement between the parties' respective experts is insufficient to show the

9   existence of deliberate indifference. *See, e.g.*, *Brooks v. Alameida*, CIV S-03-2343 JAM, 2011 WL

10   3684510 (E.D. Cal. Aug. 23, 2011) ("Thus, even if plaintiff presented a medical opinion [of] a

11   qualified expert disagreeing with the treatment decision in question, lack of due care, alone, cannot

12   establish deliberate indifferent for purposes of an Eighth Amendment claim."); *Hain v. Seegmiller*,

13   2:06-CV-01298, 2008 WL 763227 (D. Nev. Mar. 19, 2008) ("The Ninth Circuit held that even an

14   expert's disagreement with the course and competence or treatment, or conclusive evidence of

15   negligence, does not establish deliberate indifference to serious medical needs."). In any event, even

16   if Dr. Richman's reliance on Righetti's non-ambulatory status was "medically unacceptable," there

17   is nothing in the record indicating that Dr. Richman acted with subjective intent to deliberately

18   ignore Righetti's medical needs.

19         Dr. Richman's understanding that non-ambulatory status may counsel in favor of

20   conservative, non-surgical treatment is not only supported by Dr. Sampson and views of other

21   orthopedic consultants, it is not so facially implausible to indicate deliberate indifference as opposed

22   to negligence or medical malpractice. Sampson Decl. ¶¶ 5,6; Nguyen Decl. ¶ 30; Osgood Decl., Ex.

23   F, at 677. Considering Righetti's inability to walk as a factor in determining whether emergency

24   surgery is needed to repair the hip is distinct from a doctor making treatment decisions based on

25   facts or circumstances unrelated to the patient's medical needs. *Compare Snow*, 681 F.3d at 987

26   (rejecting surgical intervention, in part, because the patient was a death row inmate).

27

28

1    Finally, the record demonstrates that Dr. Richman – despite having ruled out surgery on that

2    date – ordered a one-week follow up examination for Righetti with the orthopedic clinic.  Osgood

3    Decl., Ex. I, at 580.  This fact weights against a finding of deliberate indifference.

4    For the foregoing reasons, the Court finds that Righetti has failed to demonstrate the

5    existence of a genuine dispute as to whether Dr. Richman acted with deliberate indifference.

6    Accordingly, Dr. Richman's motion for summary judgment is **GRANTED**.

7    B.    Righetti Has Failed to Exhaust His Administrative Remedies as to Defendant Zuniga

8    Under the Prison Litigation Reform Act, prisoners must exhaust all available administrative

9    remedies before filing suit.  *See* 42 U.S.C. § 1997e(a).  "A grievance suffices to exhaust a claim if it

10   puts the prison on adequate notice of the problem for which the prisoner seeks redress."  *Sapp v.*

11   *Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010).  In *Sapp*, the court also noted that in light of

12   California's regulations, a grievance is sufficient "'if it alerts the prison to the nature of the wrong

13   for which redress is sought.'"  *Id.* (quoting *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009)).

14   Similarly, the grievance must provide "enough information . . . to allow prison officials to take

15   appropriate responsive measures."  *Griffin*, 557 F.3d at 1121 (quoting *Johnson v. Testman*, 380 F.3d

16   691, 697 (2d Cir. 2004))  Here, Plaintiff did not exhaust any claims as to Defendant Zuniga.

17   It is important to look at the issues raised by the *initial* grievance because any issues raised

18   for the first time on appeal will be deemed not exhausted.  *See* Cal. Code of Regs., tit. 15, §

19   3084.2(b)(1) ("New issues raised in the supporting documents [on appeal] shall not be addressed and

20   any decision rendered will pertain only to the present appeal issue and requested action(s).");  *see*

21   *also Woodford v. Ngo*, 548 U.S. 81, 91 (2006) (recognizing that "[p]roper exhaustion demands

22   compliance with an agency's deadlines and other critical procedural rules").  Thus, in *Sapp*, the

23   Ninth Circuit held that the plaintiff's administrative grievance appeal had been properly screened

24   because "an inmate must first present a complaint at the first level of the administrative process."

25   *Sapp*, 623 F.3d at 825; *see also Dixon v. LaRosa*, No. 2:10-CV-1441 GEB KJN, 2011 WL 3875806

26   (E.D. Cal. Aug. 31, 2011) (finding retaliation claims, though similar to those raised in the initial

27   grievance, were not exhausted because they differed in time and responsible parties and "plaintiff

28   cannot raise new claims during the appeals process").

United States District Court

For the Northern District of California

On July 22, 2007, Righetti filed a grievance generally describing the incident on July 11, 2007. Schmalz Decl., Ex. 3, at 18. The only reference to Zuniga in this initial filing is that "CNA Ida Guzman and CNA Marcela Zuniga were getting me up to my wheelchair. CNA Zuniga was to the right side of my bed." *Id.* The grievance generally described his fall, that he was taken to Natividad, that he was returned to his room and that as a result of the pain, he has been prevented from doing his range of motion exercises, shower, and his left leg was "very painful." *Id.* at 20. His "action requested" was that CNA *Guzman* be counseled "not to rush" and to "consider the consequences of her actions to [his] health and safety" and to recover monetary damages do to his "pain and suffering." *Id.* at 18.

However, when Righetti appealed this grievance to the Director's level, he wrote the following:

> Dissatisfied: the so called "refresher training" is not apparant [sic] as all three CNAs have left me in painful positions and/or continue to take risks [sic] with my health and safety. CNA Zuniga has gotten very rough and indifferent with my car, they all continue to be rushed. Dropping me was not an accident it was deliberate indifference as it has been made verbally clear that it is acceptable that I receive substandard care because I am in prison.

*Id.* at 19. This appeal expanded his grievance in two ways – first, it expressly encompasses conduct of Zuniga (and not just Guzman) and, second, what had originally been a grievance about CNA Guzman rushing and thus causing an accident has turned into (1) CNA Zuniga has gotten "very rough and indifferent" with his care and (2) the fall wasn't an accident. The Director did not consider these issues, stating "[i]t is noted that at the DLR, the appellant states CNA Guzman intentionally dropped him. The appellant did not initially raise the issue that staff intentionally dropped him . . . ." *Id.*

This case is comparable to *Brown v. Saca*, No. 09-01608 ODW (§), 2011 WL 835600 (C.D. Cal. Feb. 4, 2011). There, plaintiff sued three correctional officers for deliberate indifference arising out of a car crash that occurred while the defendants were escorting plaintiff. *Id.* at *1. The court found that the plaintiff had failed to exhaust his administrative remedies. His only grievance complained that three unknown officers struck a vehicle, failed to report the vehicle evidence, and caused plaintiff a neck injury (though plaintiff indicated that he would be evaluated by medical

United States District Court

For the Northern District of California

staff). *Id.* at *5.  Plaintiff requested that the officers "file an official report of the incident" and "be held accountable for their poor judgement [sic], misconduct of procedures, and negligence of inmate welfare. *Id.*  Plaintiff nonetheless argued that he had exhausted his remedies as to his deliberate indifference claim because he had sent letters to prison staff complaining that the doctors had failed to give him "adequate medical attention" for his injuries and were only giving him ibuprofen despite the fact that his head and neck pain was worsening.  Plaintiff requested that he be sent to an "outside doctor" for a second opinion. *Id.* at *8.  The court noted that these letters could not have been included in his grievance appeal since the letters raised "new issues and requested relief not previously sought." *Id.* at *9.  Accordingly, the court found that because the letters "raised new issues not presented in his . . . grievance and sought relief not previously requested," they could not constitute exhaustion. *Id.*

The record demonstrates that Righetti's initial grievances did not encompass his current claim of deliberate indifference against Zuniga.  A grievance describing his fall and requesting that only CNA Guzman be counseled not to "rush" would not have put prison officials on notice that Righetti was also complaining that CNA Zuniga had treated him "roughly" in the aftermath of the fall – especially not in the malicious, intentional way alleged in this action.  Accordingly, Defendant Zuniga's motion for summary judgment is **GRANTED**, and Righetti's claims against her are dismissed without prejudice. *See Terrell v. Brewer*, 935 F.2d 1015, 1019 (9th Cir. 1991) (holding that the proper remedy for failure to exhaust administrative remedies is dismissal without prejudice).

///
///
///
///
///
///
///
///
///

**United States District Court**
For the Northern District of California

1

### IV.   CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are **GRANTED**. This order disposes of Docket Nos. 149 and 156.  The Court will enter a final judgment pursuant to this order.[11]

IT IS SO ORDERED.

Dated:  April 29, 2014

_____
EDWARD M. CHEN
United States District Judge

_____

[11] The Court commends and thanks Lyndsie Schmalz, Darin Snyder, Mimi Vu, Robin Wall, and Rachel Zuraw of the law firm of O'Melveny & Meyers LLP as well as Lorin Kline, Dixie Noonan, and Meghan Woodsome, formerly of O'Melveny & Myers LLP, for their excellent pro bono representation of Mr. Righetti in this action.